UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ZHAOJIN DAVID KE,
Plaintiff in Pro Se,

Civil Action No. _10 · CV - 448_

v.

ASSOCIATION OF
PENNSYLVANIA STATE
COLLEGE & UNIVERSITY
FACULTIES AND CELIA (C.J.)
ELDER,
Defendants.



FILED

Feb. 24 2010

PER
HARRISBURG, PA.          DEPUTY CLERK

**COMPLAINT AND DEMAND FOR JURY TRIAL**

## I. INTRODUCTORY STATEMENT:

1. Plaintiff Zhaojin David Ke, PhD ("Dr. Ke"), was a full member of the

    Association of Pennsylvania State College & University Faculties ("APSCUF")

    from 2001 through 2007. He brings this civil rights action to obtain relief from

    the race-based discrimination in terms of disparate treatment and loss of

    employment during the course of his grievances with APSCUF.

2. He also brings action to enforce the provisions of Title VII of the Civil Rights

    Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII "). On

    December 4, 2009, the EEOC issued a right-to-sue letter to Dr. Ke. (Exhibit 1).

3. Despite his three serious petitions with APSCUF for it to arbitrate his tenure

    denial grievance to save his employment, as in accordance with the Collective

Bargaining Agreement ("CBA"): Article 15. F.2 and G.3, APSCUF and Celia (C.J.) Elder, head of its Contract Department, aided and abetted the discrimination and retaliation against Plaintiff by the Edinboro University of Pennsylvania ("EUP") by repeatedly rejecting his requests, by abandoning his grievance, and by going overboard to do that through manipulation and fraud.

4. In doing so, APSCUF and Elder virtually participated in the adverse working conditions Dr. Ke was subjected to, as well as refusing to implement decisive remedial measures as stipulated in CBA. Thus, Defendants have placed their imprimatur of approval on the discriminatory and retaliatory treatment and hostile environment to which Dr. Ke was subjected at EUP.

5. The worst was that Defendants themselves started discriminating against Plaintiff, as shown in their taking white professors' terminations to arbitrations but refusing to arbitrate Plaintiff's tenure denial grievance in violation of CBA: Article 3 and Article 15. F.2 and G.3. The result of their conduct was to perpetuate race-based employment discrimination and retaliation as carried out by EUP.

6. Defendants' practices, procedures, and conduct are in violation of Dr. Ke's rights as guaranteed by the Civil Rights Act of 1871, 42 U.S.C. §1981, §1983, §1985, *et seq.*, in so far as those statutes create a cause of action to enforce rights guaranteed by the Fourteenth Amendment to the United States

2

Constitution and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

7. Dr. Ke also asserts a pendent state law claim against Defendants based on the Pennsylvania Human Relations Act ("PHRA"), §5(c)(d)(e), 43 P.S. § 951, *et seq.*, and any other state laws prohibiting the acts alleged herein, such as those in which the defendants aided and abetted discrimination and retaliation and even directly participated in them.

8. Dr. Ke seeks award of declaratory and injunctive relief, monetary damages and such other relief, including an award of costs and attorney's fees if he obtains legal representation later on, as is necessary to ensure and effectuate his federal and state civil and constitutional rights.

## II. JURISDICTION:

9. This Court has jurisdiction this the action under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. §§ 1331 and 1343, which give federal district courts jurisdiction over federal questions, as well as authority to award appropriate relief from the violation, under color of state law, of any constitutional right or federal statute providing for the protection of civil rights. Additionally, the Court has jurisdiction to declare the rights of the parties to this action pursuant to 28 U.S.C. §§2201 and 2202.

**10.** The Court has pendent jurisdiction to adjudicate Dr. Ke's state law claim

pursuant to 28 U.S.C. § 1367(a).

## III. PARTIES:

11. Plaintiff Dr. Ke is an adult individual currently residing at 4025 East Roosevelt

Boulevard, Philadelphia, Philadelphia County, Pennsylvania 19124.

12. Defendant APSCUF is a body corporate in Pennsylvania, established pursuant

to the laws of the Commonwealth of Pennsylvania and certified by the

Pennsylvania Labor Relations Board. It is a "<u>person</u>" within the meaning of 42

U.S.C. § 2000e (a). In *Local 194*, *Retail*, *Wholesale & Department Store Union*

*v. Standard Brands*, 540 F.2d 864, 866 (7th Cir. 1976), the plaintiff was

considered a "person aggrieved." By the same logic, APSCUF is an aggrieving

"person."

13. It is also a labor organization within the meaning of PHRA, §4(d). Its official

address is 319 North Front Street, Harrisburg, PA 17108.

14. In its position statement to the EEOC dated August 25, 2008, APSCUF tried to

take advantage of the language of Title VII that tends to confine labor

organizations to only those engaged in an industry affecting commerce. It is

true that there is argument that a labor organization is not covered by Title VII

if it does not deal with a Title VII employer, but unlike the definition of

4

"employment agency," that of labor organization is not limited by reference to an "employer."

15. Under §701(d) of Title VII, while a Title VII "labor organization" "includes any organization of any kind… which exists for the purpose... of dealing with [Title VII] employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment," the same provision does not exclude from coverage labor organizations that deal with employers not covered by Title VII. See *Jennings v. American Postal Workers Union*, 672 F.2d 712, 28 EPD ¶ 32,533 (1982), in which the Eighth Circuit found jurisdiction over a federal employees union despite the fact that the employing entity (the U.S. Postal Service) was not a Title VII employer. The court reasoned that Section 703 of Title VII provides a cause of action against labor organizations for unlawful employment practices and that the fact that the labor organization represented federal employees was not controlling.

16. It is clear that Title VII provides a cause of action against labor organizations for unlawful employment practices. See 42 U.S.C. § 2000e-2(c). Thus, the fact that APSCUF is a labor organization representing state employees is not controlling and Title VII has jurisdiction over this Complaint under its §703(c), 42 U.S.C. § 2000e-2(c).

17. The hard fact is that APSCUF <u>does embrace the jurisdiction of Title VII</u> in

CBA where it states in Article 3(C):

> If any provision of this Agreement [CBA] is in conflict with ...<u>The Civil Rights Act of 1964, as amended,</u> or ...the State System Equity Plan, the provisions of such orders, laws and rules shall prevail...

APSCUF shall not seek protection from Title VII when it impacts its interests in

CBA and repulse it when legal action is taken against APSCUF in terms of

Title VII. It simply cannot reverse positions in different circumstances to

violate the principle of judicial estoppel.

18. Defendant Celia J. Elder was head of the Contract Department of APSCUF who

used her discretionary power, through fraud, to deny Dr. Ke the right to

arbitration, as stipulated by CBA: Article 15. F.2 and G.3. She was an

administrative official of Defendant APSCUF and a person primarily

responsible for ensuring that APSCUF comply with federal anti-discrimination

laws and that all APSCUF members were provided with a union free of

unlawful racial discrimination and unfair labor practices. She is being sued in

her individual and official capacities. She at all times performed her duties at

319 North Front Street, Harrisburg, PA 17108.

## IV. FACTS:

19. Defendants have discriminated against Dr. Ke, a former member of APSCUF,

on the basis of his race, Chinese, and his national origin in violation of §§703(c)

6

and 703(k)(1)(A) of Title VII, 42 U.S.C. § 2000e-2 and §704(a) of Title VII, 42 U.S.C. § 2000e-3 among other ways, by subjecting him to disparate treatment in the handling of his grievances, which created an intimidating, hostile or offensive environment and which adversely affected the terms, conditions and privileges of his membership in APSCUF.

## Count I:

## (Race Discrimination)

20. Paragraphs 1 through 19 are incorporated by reference, as fully as if they were set forth at length herein.

21. Throughout his employment at EUP from August 2001 through December 2007, EUP intentionally discriminated against Dr. Ke because of his race, Chinese, in violation of Title VII. Dr. Ke was systematically subjected to unequal terms and conditions of employment. From 2004 through 2007, Dr. Ke officially grieved through APSCUF three times about racial discrimination at work, but on none of the occasions did APSCUF pursue the grievances to resolve the problems.

22. In October 2006, Plaintiff took EUP to EEOC. EUP immediately began to retaliate against him, ending up in denying him tenure in December 2006, as APSCUF affirmed in <u>Grievance ED 01-01-2007.</u> Plaintiff asked APSCUF to grieve his tenure denial in late December 2006. At the beginning of February

2007, APSCUF sent <u>Grievance ED 01-01-2007</u> to the Pennsylvania State System of Higher Education ("PASSHE") and, at the same time, informed Dr. Ke by letter that APSCUF would not take his grievance to Step-4—arbitration.

23. PASSHE never responded, as expected, and APSCUF simply abandoned Dr. Ke just because he was Chinese and was from China. By comparison, APSCUF always arbitrated white professors' terminations. In June 2008, Dr. Ke did some initial investigation and has the following to report to Court.

24. Dennis Lutz, a white faculty member in the Department of Speech, Language & Hearing at EUP was denied tenure in Spring 2006. APSCUF took his case to arbitration in Fall 2006, and he won his job back. Dr. Ke talked to him on the phone on June 23, 2008 at 5:30 p.m. He told Dr. Ke that he had not even asked the union to take his case to arbitration as he was ready to make a start elsewhere. The union nevertheless took his case to arbitration. He said that there was no hearing and that he had only talked to an arbitrator before he got his job back. He returned to work in the fall of 2007.

25. There was a white woman faculty member who was also denied tenure in 2006. APSCUF took her case to arbitration and won her job back. She returned to work also in the fall of 2007. Although Plaintiff does not have her name, APSCUF can provide it and other relevant details through Rule 26. Several faculty members told Plaintiff that. APSCUF's Edinboro grievance committee

8

member Mary Jo Campbell confirmed it with Jean Snyder, a discharged music professor, in February 2008.

26. Jean Snyder (white) did not have her contract renewed in December 2007 at the end of her first year as a tenure-track assistant professor of music. She told Plaintiff on the phone on the morning of June 30, 2008 that her discharge was due to the dean's gender and age discrimination against her. She grieved with APSCUF in January 2008, and only a month later (in February) APSCUF informed her that they would arbitrate her termination.

27. By arbitrating only white faculty's terminations but not Plaintiff's, APSCUF created a cause of discrimination in terms of disparate treatment in light of Title VII. §703(c).

28. By arbitrating only white faculty's terminations but not the terminations of faculty of protected classes and by having not arbitrated a single termination of a faculty of color at EUP, APSCUF has established the material fact of discrimination through disparate treatment in light of Title VII. §703(m) and therefore created a true cause of action.

29. In Plaintiff's case, it was intentional, willful disparate treatment by APSCUF. This was corroborated when he recalled how APSCUF had treated his grievances all along—ever since Fall 2004.

30. In Fall 2004, Dr. Ke requested APSCUF to grieve his department's discrimination against him. APSCUF "did" and even gave him a copy of the Step-2 grievance, but in reality it never filed it with EUP and only lied to him that it had. Plaintiff found that out in Spring 2007 when David Obringer, President of APSCUF's Edinboro branch (<u>Dr. Ke mostly dealt with APSCUF's head office in Harrisburg through him</u>), told him that the 2004 Step-2 grievance had never been presented to EUP.

31. In May 2006, Dr. Ke requested APSCUF to grieve EUP's discrimination against him in work assignment. President Obringer asked Dr. Ke to talk to local grievance committee head James Palin, who cited his wife teaching in the English department as reason to decline to assist.

32. Obringer then asked Dr. Ke to talk to Mary Jo Campbell, a grievance committee member. Dr. Ke called her, and she said she could never help Dr. Ke because she had represented former Chairperson Donald Sheehy in Fall 2004 when Dr. Ke had complained to EUP about Sheehy's discrimination against him. Later, Dr. Ke emailed her the same request, but she never responded.

33. In October 2006, Dr. Ke grieved EUP's discrimination and retaliation against him with the local APSCUF office, which initially ignored him. Then the grievance was moved forward to Step-3. APSCUF in Harrisburg faxed it to PASSHE in November 2006 and mentioned in the fax that a hardcopy was in

the mail. PASSHE never responded, and APSCUF never followed up. When Dr. Ke made inquiries in January 2007, Defendant Elder said she was sorry that the original grievance did not count because the grievance letter did not bear any signature. Dr. Ke provided a copy of the faxed grievance that bore a signature.

34. What really happened was that PASSHE ignored the grievance, and APSCUF simply refused to follow up because Dr. Ke was an insignificant Chinese faculty member. By comparison, previous chairperson Donald Sheehy made a complaint about EUP for redlining him in a reelection, and APSCUF immediately took it to the Pennsylvania Labor Relations Board for a ruling.

35. In 2007, Dr. Ke implored APSCUF to arbitrate his tenure denial three times—in January, March, and October. Dr. Ke first talked to President Obringer and then to Defendant Elder. After he received the February 9, 2006 letter from Elder that denied his arbitration request, Dr. Ke implored her to reconsider the decision while he kept asking Obringer to persuade the head office. In April 2007, Defendant Elder sent Dr. Ke another denial letter. In May 2007, Obringer told Dr. Ke that nobody had taken Edinboro University to EEOC and won and asked how he felt the EEOC would rule on his complaint. Dr. Ke said he had supplied a mount of evidence and believed the EEOC would rule in his favor.

Obringer said if he received determinations that ruled against the university
APSCUF would reconsider his request for arbitration.

36. In October, Dr. Ke was armed with EEOC's determinations (Exhibit 2)[1]—

which were a material fact. See *Bogard v. Cannon & Wendt Elec. Co.*, 221

Ariz. 325, 335-36, ¶ 14 , 212 P.3d 17, 27-28 (App. 2009)—and knew that

APSCUF ought to act on CBA: Article 15. F.2 and G.3, but APSCUF again

refused to arbitrate his grievance, finally giving him the statement on November

5, 2007 that "our contract determines what we can do. The EEOC operates

under a different set of rules. Their ruling does not affect your denied

grievance."

37. Even by early December 2007, Dr. Ke was still reasoning with President

Obringer, stating that CBA did stipulate in Article 15. F.2 and G.3 that if a

tenure denial involved discrimination and retaliation the grievance ought to go

to arbitration and be expedited.  He even questioned that if APSCUF had not

prepared to take his case to arbitration why it had used strong language in the

Step-3 grievance to unmistakably give him the impression that it would defend

his rights and why APSCUF had presented the Step-3 grievance to PASSHE in

the first place. Dr. Ke reiterated that it was just unfair that he was ignored while

white professors' tenure denials were taken to arbitration and that a white

---

[1] The EEOC issued altogether three determinations. The third one amended the
previous two. So only the third one is attached.

woman professor had just thanked him for accompanying her all the way to Harrisburg to attend an arbitration.

38. Therefore in light of Title VII. §703(k)(1)(A), discrimination in terms of disparate treatment occurred, and this action was intentional and willful because Defendant Elder manipulated/lied about APSCUF's State-wide Grievance Committee ("SGC") meetings to make sure it would not approve Dr. Ke's grievance for arbitration. That was a fraudulent labor practice. She knew EEOC had made determinations against EUP on both discrimination and retaliation charges. By now, Dr. Ke had also learned that APSCUF had even taken white professors' tenure denials in other state universities to arbitration and helped them get reinstated.

39. Several times, Dr. Ke heard from President Obringer that the head office believed that in history APSCUF had never taken a tenure-denial grievance based on discrimination to arbitration and that Dr. Ke's complaint about EUP's discrimination and retaliation was baseless.

40. President Obringer also said that although he personally had a different opinion, technically the reason why Dr. Ke's case was not arbitrated was that he had not received a positive vote from the chairperson. Dr. Ke argued that the chairperson was the very person who (together with the dean) had dynamically discriminated and retaliated against him and that her refusal to give him the

vote for tenure was part of EUP's retaliation, as confirmed by EEOC. He

suspected that the university-wide tenure committee, manipulated by the human

resources office, must also have lied in its recommendation (which accounted

for another vote). He needed APSCUF to get a copy of the recommendation so

that he could respond to it, but APSCUF refused to help.

41. Plaintiff strongly believed that the real reason why APSCUF refused to arbitrate

his termination was that he was a Chinese from China and a faculty member of

color.

### Count II:

### (Depriving Dr. Ke of his right to arbitration through manipulation and deception)

42. Paragraphs 1 through 41 are incorporated by reference, as fully as if they were

set forth at length herein.

43. As though race discrimination were not enough, APSCUF even worked to

deprive Dr. Ke of his right to arbitration—hence the right to due process—in

violation of CBA: Article 15. F.2 and G.3. The deprivation was carried out

through manipulative, deceptive means.

44. After PASSHE ignored APSCUF's  Step-3 grievance regarding his tenure

denial,  Dr. Ke requested APSCUF to advance his grievance to Step 4—

arbitration—and said he had the right to that. APSCUF said they would decide on his request at an SGC meeting.

45. Defendant Elder gave Dr. Ke a letter dated February 1, 2007, telling him that "the Statewide Grievance Committee will decide whether to arbitrate [his] grievance at its April, 2007 meeting" and that "a staff-prepared summary of [his] case will be mailed to the Committee approximately two weeks prior to its meeting." She added that Dr. Ke could write a summary of his case and attach to it the evidence he had and that the summary "must be received by March 30, 2007." That sounded quite fair, but the reality was to prove it a fraud.

46. Even in its position statement written for EEOC dated August 25, 2008, APSCUF wrote:

> Prior to each SGC meeting its members are sent an APSCUF-staff-prepared summary of the grievance as well as the grievance itself, any employer answers to the grievance, and any supporting narrative and other materials submitted by the Grievant or obtained through the grievance investigation. This was done prior to the SGC's consideration of Dr. Ke's grievance.

That was also a blatant lie, as can be proved by the following.

47. Dr. Ke knew APSCUF had only the grievance letter they had filed with PSSHE and began to prepare the summary. He was also ready to supply the mount of evidence he had sent to the EEOC. However, Defendant Elder high-jacked the procedure by holding a surprise meeting only two days later—on February 3,

2007. Then she wrote to Dr. Ke on February 9, 2007 that the SGC had already

met and had decided not to take his case to arbitration.  The letter never

explained why the SGC had denied Dr. Ke's arbitration request.

48. Dr. Ke strongly doubts if the alleged meeting ever took place. He thought

Defendant Elder could have fabricated everything.  But if the meeting,

irresponsible as it sounded, had indeed taken place, then Defendant Elder must

have manipulated it through deceptive means to prevent the SGC from

approving Dr. Ke's grievance for arbitration.

49. In retrospect, Dr. Ke firmly believes that if he could indeed have supplied his

detailed summary of EUP's discrimination and retaliation against him and the

mount of evidence to the SGC members prior to their meeting, the members

would have been motivated to adopt Article 15. F.2 and G.3.

50. Dr. Ke called Defendant Elder and left messages, but she never responded. Dr.

Ke then emailed her to let her reconsider her decision, but although she said Dr.

Ke could ask her questions she never responded regarding the decision. Dr. Ke

then had to talk to President Obringer, who was sympathetic and said he

believed Dr. Ke was right and promised to talk to the Contract Department.

51. Then Defendant Elder surprised Dr. Ke with another letter dated April 24, 2007,

saying that the SGC had met again and reconsidered his request and had

"decided not to change its original decision to deny [his] grievance to

arbitration."Again there was no explanation given as to why the arbitration request was denied. The letter made Dr. Ke speechless because it was completely insane to have another meeting without allowing Dr. Ke to submit his summary and mount of evidence.

52. APSCUF told EEOC in its position statement that "prior to each SGC meeting its members are sent an APSCUF-staff-prepared summary of the grievance as well as the grievance itself." Time-wise, APSCUF could never possibly have done that WITHIN TWO DAYS—not to mention the fact that Dr. Ke had never submitted his summary and mount of evidence. It takes usually three to four days just for first-class mail to travel from Harrisburg to Western Pennsylvania.

53. PASSHE never responded to Dr. Ke's Step-3 grievance, so there was no "employer answers" either for the SGC members to consider, as APSCUF lied in its position statement. So if a decision was made based on flimsy or no evidence, the decision could never have been right. This again indicates that Defendant Elder manipulated or lied about the (second) meeting.

54. Looking back, APSCUF always intentionally deprived Dr. Ke of his right to grieve. In Fall 2004, he requested APSCUF to grieve racial discrimination. It "did" and even gave him a copy of the Step-2 grievance letter, but it never sent the grievance to EUP and only lied to him that it had. Dr. Ke learned about that from President Obringer in early 2007.

55. In October 2006, Dr. Ke requested APSCUF to grieve EUP's discrimination against him with respect especially to disparate treatment through work assignment. The local APSCUF branch did. Then the grievance moved up to Step-3, which was filed by APSCUF in Harrisburg in November 2006, but there was no follow-up at all. When Dr. Ke made inquiries, Defendant Elder lied that the grievance did not count because it did not bear any signature. What really happened was that APSUCF simply refused to follow up because Dr. Ke was a Chinese faculty member.

56. As part of the retaliation, EUP's university-wide tenure committee wrote a libelous recommendation for Dr. Ke. He repeatedly asked for a copy of it so that he could refute it, but Susan Norton, head of the committee, said that she could only release a copy to APSCUF. Dr. Ke requested President Obringer to get a copy for him several times, but he always refused.

57. In January 2007, following his tenure denial, Dr. Ke requested APSCUF to grieve for him. APSCUF sent in a Step-3 grievance, but PASSHE never responded. The Step-4 grievance was for APSCUF to arbitrate the case. Dr. Ke pointed out that the tenure denial was part of EUP's retaliation, as confirmed by EEOC. He cited CBA: Article 15. F.2 and G.3, but APSCUF simply refused to arbitrate Dr. Ke's grievance because of his race.

58. In early October 2007, Dr. Ke received the determinations from EEOC that ruled against EUP on both discrimination and retaliation charges. President Obringer agreed that Dr. Ke had a stronger argument now and again talked to APSCUF in Harrisburg. Defendant Elder reconsidered it but once again decided not to arbitrate the grievance. This time she said that EEOC and APSCUF operated "under a different set of rules. Their ruling does not affect [his] denied grievance." In doing so, APSCUF nipped Dr. Ke's final chance to get his job back in the bud.

59. Dr. Ke believes that APSCUF should have reviewed his mount of evidence and invited him to the SGC meeting to address its members as other discharged members had done. That was his right. In doing what they did, Defendant Elder and APSCUF deprived him of the right to have his evidence presented to SGC to result in a fair decision.

## Count III:

### (Aiding and Abetting EUP in Discrimination and Retaliation against Dr. Ke)

60. Paragraphs 1 through 59 are incorporated by reference, as fully as if they were set forth at length herein.

61. Plaintiff gave EUP the best years of his career, and now he is fifty-five. Because EUP stalled his career by only allowing him to teach lower-level composition classes and because of his age, Dr. Ke has found it hard to land

another job.  Regarding that, APSCUF is responsible too since it connived at the hostile environment Dr. Ke worked in and aided and abetted EUP in its discrimination and retaliation against him.

62. On September 8, 2006, Dr. Ke complained to EUP about Chairperson Riva Sharples's racial discrimination against him. At the end of the complaint, he wrote that if EUP did not resolve his complaint this time he would take the case to EEOC for a ruling. After that, retaliation started, Plaintiff kept APSCUF informed—through President Obringer—but APSCUF again resorted to deliberate indifference. The local union even refused to file a grievance until Plaintiff contacted the Contract Department of APSCUF in Harrisburg.

63. After APSCUF filed the first Step-3 Grievance with PASSHE on Nov. 8, 2006 and the latter ignored the grievance, APSCUF refused to pursue the grievance. In January 2007, Dr. Ke asked Defendant Elder what had happened to the Step-3 Grievance, and she said she was sorry that the grievance did not count because it did not bear any signature. Dr. Ke said the grievance bore a signature and he had a copy to prove it.

64. To avoid retaliation, Dr. Ke had written EUP that he did not want his current chairperson to write the evaluation for his tenure application. Dr. Ke had even offered a list of thirteen people for EUP to choose one to write it, as permitted

by CBA: Article 12, but APSCUF, like EUP, insisted the chairperson write the evaluation to let her retaliate against Dr. Ke.

65. Regarding that, Riva Sharples herself wrote that she

> [N]ever insisted on writing the letter…. [she] received a copy of Dr. Ke's request to the administration that she not write his tenure evaluation. However, upon checking with the <u>Union, Edinboro University, and with the administration, s</u>he was told that she needed to fulfill her duties as Chair unless the administration appointed someone else to write the letter, <u>as specified in the Union contact</u>.

Ironically, APSCUF even grieved that in <u>Grievance ED 01-01-2007</u>.

66. Former Chairperson Donald Sheehy was redlined when he ran for reelection as chairperson, as EUP's compromise with Dr. Ke for complaining about racial discrimination in Fall 2004. Donald Sheehy retaliated by writing a prejudicial evaluation about Dr. Ke for the fall of 2004—after writing five glowing evaluations about him—and hid it from Dr. Ke in violation of CBA. Riva Sharples quoted from it in her own evaluation letter written for Dr. Ke's tenure application. APSCUF was fully aware of that, but it never insisted that EUP do not use that letter and provide a copy to Dr. Ke.

67. On September 29, 2006, Dr. Ke had a meeting with the dean, the chairperson, and the head of the human resources office. Former president of the APSCUF Edinboro branch Sherry Reynolds was a union representative for the chairperson and vigorously defended her and EUP. The meeting was really one

between Dr. Ke and EUP, and APSCUF ought to have represented only Dr. Ke. That shows how APSCUF sided with EUP.

68. At APSCUF's connivance, chairperson Riva Sharples wrote a malicious tenure recommendation filled with lies. The letter alleged that Dr. Ke's teaching was "a concern," his scholarship was "equally troubling," and his service was also "a concern," whereas she had written a recommendation, already prejudicial, for his promotion application only ten months earlier, in which she had nevertheless stated that "in the classroom, Dr. Ke does a fine job" and that "Dr. Ke is doing a good job as a teacher and colleague in the Department of English & Theatre Arts." The reason she was so bold in making a "U" turn was that EUP wanted her to be the attack dog and APSCUF connived at her.

69. Her libelous letter was on display in the department office for two weeks, during which she urged people not to vote for Dr. Ke's tenure because "Dr. Ke desires—and would surely demand if granted tenure—to teach more than basic composition in the Department of English & Theatre Arts." (That was how EUP discriminated against Dr. Ke through work assignment.) Dr. Ke told the local APSCUF that such display was retaliation in broad daylight, but APSCUF did not intervene. At the end of her letter, Riva Sharples concluded: "I cannot recommend Dr. David Zhaojin Ke for tenure at Edinboro University." That was how he lost one vote, which later APSCUF used to justify its discrimination.

70. Her letter was forwarded to the university-wide tenure committee, which, manipulated by the head of the human resources office, further retaliated against Dr. Ke by producing another libelous recommendation. For example, it lied that Dr. Ke had submitted "two course proposals that were lacking in depth and specificity [and] were turned down by the ETA Dept," whereas EUP had always refused to accept his proposal while accepting everybody else's, as can be proved by the grievance APSCUF failed to file in Fall 2004. Ironically, the lie was even rebutted by EUP's counsel Susan Malone in her "Answer" (¶40) to Dr. Ke's Complaint against EUP filed with the US District Court in Erie, PA.

71. The committee's letter cost Dr. Ke one more vote. EUP President Frank Pogue (part of the retaliation force) turned down Dr. Ke's tenure with the excuse that he had failed to get two positive votes. APSCUF harped on the same tune in order not to arbitrate Dr. Ke's grievance in violation of CBA: Article 15. F.2 and G.3. So the aiding and abetting was palpable, and Dr. Ke could not help feeling that APSCUF was virtually adding itself to EUP's retaliation against him.

72. In the fall of 2006, Dr. Ke was undergoing the fifth-year evaluation, as required of every tenure-track professor. The administration told Rosemarie Blair, head of the English department evaluation committee, that they should not waste their time evaluating Dr. Ke because was already a goner. Even the department

chairperson did not write her fifth-year evaluation of Dr. Ke. By this time, two of his colleagues had already evaluated his teaching. He was waiting for EUP to do the student evaluation. He complained to APSCUF about the interruption, calling it an act of retaliation and also telling the union that EUP applied different standards to his tenure application, but APSCUF again showed deliberate indifference.

73. The denial of tenure was sheer retaliation because the evaluations of Dr. Ke's performance and teaching from various sources for the first four years of his employment (altogether about fifty pieces) and the partial evaluation of his fifth-year performance were all totally positive and shining. In those evaluations, Dr. Ke was consistently described in such positive terms as "a valued member of the Department of English," "a responsible member of department committees," and "an outstanding colleague, excellent scholar, and dedicated professor." Because of his strong standing, Dr. Ke's contract was renewed each and every year until he was denied tenure in December 2006.

74. Ironically, in the year EUP denied Dr. Ke tenure, both his dean and provost recommended him for promotion, and the EUP president even signed an award letter to praise Dr. Ke "For Outstanding Service in the Faculty Tutorial College/Fall 2006" in the same month that he denied Dr. Ke tenure.

75. The retaliation was made especially heinous when Terry Smith and Riva Sharples staged a drama to psychologically attack Dr. Ke. First Riva Sharples claimed that Dr. Ke was going to use violence on her for denying him a tenure vote. So Terry Smith brought Dr. Ke to his office to give him a stern warning on October 2, 2006. At the same time, EUP assigned the chairperson a bodyguard to protect her every minute she was on campus. Given the fact that Dr. Ke had never had a criminal record and had never used violence on anybody in the past and the fact that he was already a victim of retaliation, such action was very vicious and humiliating. While it nominally grieved that, APSCUF at the same time informed the chairperson about the procedure of how to have herself "protected."

76. Because of APSCUF's connivance, the head of the human resources office drafted the tenure denial letter for Dr. Ke in violation of CBA: Article 15 (she was not supposed to get involved at all) and only let the EUP president finalize it with his signature. That was another act of retaliation. APSCUF had received a copy of it, but again showed deliberate indifference.

77. Dr. Ke informed APSCUF that his tenure application was contaminated by EUP's retaliation, but APSCUF refused to intervene, hiding behind the excuses that Dr. Ke's complaint was baseless and that he had not received two of the three tenure votes.

25

78. Even after the tenure denial and while Dr. Ke was hanging in there, retaliation continued. The dean harassed him during the last two weeks of the spring semester of 2007 just because Dr. Ke had told a student that if she kept skipping class he would have to fail her in accordance with the university's attendance policy. Dr. Ke kept APSCUF informed through "cc" copies, but APSCUF again showed deliberate indifference.

79. In January 2008, Dr. Ke applied for unemployment compensation, and EUP lied to the PA Unemployment Compensation Board of Review that Dr. Ke had been discharged because of willful misconduct. Before a hearing in February, Dr. Ke requested a letter from APSCUF to prove that the allegation was false, but APSCUF refused to help. That convinced Dr. Ke that APSCUF's racial animus toward him was deep and that was why it had sided with EUP.

80. All this is only a portion of how APSCUF connived at EUP's retaliation against Dr. Ke. For six and a half years, Dr. Ke was subjected to an intimidating, hostile or offensive work environment, which adversely affected the terms, conditions and privileges of his employment, and APSCUF's aiding and abetting considerably contributed to that.

## Count IV:

## (APSCUF'S Blatant Violations of CBA)

81. Paragraphs 1 through 80 are incorporated by reference, as fully as if they were set forth at length herein.

82. Plaintiff was a member of APSCUF for a full 6.5 years, always faithfully paying his dues through his biweekly paychecks to contribute to the union leaders' high salaries, but when it came time for grievances, APSCUF was always reluctant to help him because of his race and national origin. That was in violation of CBA: Article 3 and Article 15. F.2 and G.3.

83. APSCUF violated CBA simply by refusing to implement it, by depriving Dr. Ke of union representation, and by conniving at EUP's blatant violations of it. That was why Plaintiff's colleagues asked him to leave quietly, saying that he was doomed to fail if he fought a state university because even the union would not help him.

84. After he received a right-to-sue letter from EEOC, Dr. Ke sought compromise on his charge and wrote to Dr. Steve Hicks, President of APSCUF in Harrisburg, stating that if the union was willing to arbitrate his case even now he would never take legal action against APSCUF regardless of the arbitration results. President Hicks wrote back on January 4, 2010, again harping on the same excuse that "two of the three bodies [votes] recommended against tenure."

85. But that was exactly what EUP's retaliation was all about, as confirmed by EEOC's three determinations. EUP manipulated the process of Dr. Ke's tenure

application, and the two non-recommendations were both from the administration (the chairperson Dr. Ke had complained about and the university-wide tenure committee controlled by head of the human resources office).

86. So using that as a pretext for not arbitrating Dr. Ke's grievance would be a totally unfair labor practice—particularly after Dr. Ke remonstrated with President Obringer and Defendant Elder about the issue of discrimination and retaliation, as admitted in APSCUF's <u>Grievance ED 01-01-2007</u>:

> The University Administration has also violated the above-referenced articles (Articles: 3, 12, 15.F, and 43) by permitting the department chair to conduct and make a recommendation regarding the Grievant's tenure application despite his objection. As a result, the chair wrote a prejudicial letter riddled with misrepresentations.

87. It was totally vicious of APSCUF to claim that the reason why it did not arbitrate Dr. Ke's tenure denial was that he had failed to get the chairperson's vote but at the same time denounced her for "[writing] a prejudicial letter riddled with misrepresentations."

88. Dr. Ke also argued that no language in CBA SPECIFICALLY STATED that just because a faculty member failed to get two of three votes he or she did not have the right to grieve. He pointed out that CBA clearly states in Article 15 (Tenure). F.2:

> That non-tenured probationary FACULTY MEMBER shall have the
> right to grieve where the non-tenured probationary FACULTY
> MEMBER asserts that the discipline is discriminatory or arbitrary and
> capricious...

89. Plaintiff quoted this to President Obringer many times and to Defendant Elder

on the phone and via email. Elder never responded, but Obringer only said he

agreed with Dr. Ke's argument and would talk to the head office in Harrisburg.

In early September 2007, President Obringer said that if Dr. Ke received

positive determinations from the EEOC he would petition the Contract

Department again and let them arbitrate Dr. Ke's grievance. He said that after

all PASSHE had never responded to their Step-3 grievance and that APSCUF

could even take the case to the Pennsylvania Labor Relations Board for a

ruling.

90. APSCUF ought to have taken Dr. Ke's case to arbitration—Step 4—after

PASSHE, as always, ignored it, but APSCUF did not pursue the case anymore

simply because Dr. Ke was Chinese. That was how APSCUF violated CBA:

Article 3 and Article 15. F.2 and G.3.

91. APSCUF's action was nothing short of discrimination because if they insisted

that Plaintiff did not get two of the three votes, then they should never have

taken Jean Snyder's complaint to arbitration since the two-vote rule did not

even apply. They did, however, because they cited Article 15. F.2 and G.3.

They helped her because she had alleged discrimination and was white, whereas Dr. Ke had alleged both discrimination and retaliation but he was Chinese.

92. The discrimination through disparate treatment was intentional and willful because Defendant Elder manipulated the SGC meetings (through fraud) to make sure the committee would not approve Dr. Ke's request for arbitration. She fully understood that Dr. Ke had been discriminated against, as shown in the strong language of all the grievances she had drafted for Dr. Ke—as particularly summed up in Grievance ED 01-01-2007:

> It has also thwarted the Grievant's course proposals in that they have never been brought up for a department vote while each and every other course proposal has been presented to the department.

> Despite the fact that he was hired to teach such courses as reflected in the position announcement to which he responded and under which he was hired, the Grievant was never given any upper-level classes to teach during his first two years of hire, has only irregularly been offered upper-level classes from 2003 to now, has never been allowed to teach a single literature class since his appointment, and has not been assigned to teach upper level courses in the spring 2007 semester.

> For the spring 2007 semester, every other single faculty member of his department is given one or two upper-level/literature classes to teach.

93. APSCUF was perfectly aware of the discrimination and retaliation against Dr. Ke, and that was why it, in the same grievance, demanded the following in the part of "Relief Requested":

That the Grievant be granted tenure and made whole for all losses, financial or otherwise, with interest.

That the letter dated December 18, 2006, from President Pogue be removed from the Grievant's personnel file.

That the University Administration cease and desist discriminating against the Grievant and permitting the discriminatory atmosphere in the Grievant's department to continue.

94. Even in their position statement, written for EEOC on August 25, 2008, APSCUF nevertheless admitted—reluctantly though—that their grievance filed with PASSHE on behalf of Dr. Ke had "alleged improper denial of tenure for the reasons set out therein, which mainly included bias by his department and department chair, failure to assign him higher-level courses to teach, and summoning him to a meeting with management without notice of its purpose or giving him an opportunity to obtain union representation."

95. CBA also states in Article 15 (Tenure). G.3 that:

If a terminated FACULTY MEMBER contests his/her termination by filing a grievance, such grievance will be handled in an expeditious fashion in the steps of the grievance procedure. If the grievance is not resolved by the third step of the grievance procedure and APSCUF requests that the grievance be submitted to arbitration, the parties will make a good faith effort to schedule the grievance for hearing before an arbitrator…

96. So it was just unfair of APSCUF to misinterpret a part of ¶4 of Article 15 to serve their discriminatory purposes while denying the parts in the same article

that stipulated that a faculty member had the right to grieve if "the discipline is discriminatory…" and that the grievance should "be submitted to arbitration."

97. In retrospect, APSCUF connived at EUP's violation of CBA (Article 12) by allowing Chairperson Riva Sharples to write a tenure evaluation, giving her the opportunity to retaliate against Dr. Ke after Dr. Ke had officially complained about her for discriminating against him.

98. CBA details the tenure application process in Article 15, and nowhere in it does it state that the head of the human resources office and the university ombudsperson (the same woman), had a right to get involved in it. However, she manipulated Dr. Ke's tenure application for retaliation purposes, as shown in a) letting the chairperson write the malicious recommendation, b) telling the department evaluation committee to stop evaluate Dr. Ke because "he's gone away," c) manipulating the university-wide tenure committee regarding Dr. Ke's tenure application, and d) drafting the tenure-denial letter only for the EUP president's "review and signature." Dr. Ke complained to APSCUF about her involvement in violation of CBA many times, but APSCUF showed only deliberate indifference.

**Count V:**

**(Mental Pain and Suffering)**

99. Paragraphs 1 through 98 are incorporated by reference, as fully as if they were set forth at length herein.

100. Dr. Ke is absolutely convinced that should he have been allowed to go to arbitration, then armed with a mount of evidence and the EEOC's three determinations he would have gotten his job back.

101. APSCUF's discrimination has caused Dr. Ke mental pain and suffering on a continuous basis and has made him experience countless sleepless nights.

102. He has been seeking remedy by way of new employment and has applied for over a hundred positions without successes.

103. Defendants, in discriminating against Dr. Ke through disparate treatment, have breached the CBA that they drafted, in addition to violating Dr. Ke's constitutional rights and federal and state laws.

104. All conditions precedent to the filing of this suit have been performed or have occurred.

## V. LEGAL CLAIMS: FIRST CAUSE OF ACTION—EQUAL PROTECTION (Both Defendants)

105. Paragraphs 1 through 104 are incorporated by reference, as fully as if they were set forth at length herein.

106. Defendants' race-based discriminatory and hostile conduct, customs, policies,

Practices, and procedures, as described in the factual section of this Complaint,
have deprived Dr. Ke of his right to equal protection of the law as guaranteed
by the Fourteenth Amendment to the United States Constitution and 42 U.S.C.
§1983.

## SECOND CAUSE OF ACTION—TITLE VII: DISCRIMINATION THROUGH DISPARATE TREATMENT (Both Defendants)

107.   Paragraphs 1 through 106 are incorporated by reference, as fully as if they
were set forth at length herein.

108.   Dr. Ke holds that he was discriminated against by Defendants on the basis
of, *inter alia*, his race and national origin, and subjected to disparate treatment
despite CBA.

109.   EEOC's Philadelphia Office received a timely charge filed by Dr. Ke
(EEOC Charge No. 530-2008-02994), in which he alleged that he had been
discriminated against by Defendants because of his race and national origin.
However, the Philadelphia office erred by failing to take into account the last
documented contact regarding the arbitration decision between Dr. Ke and
APSCUF dated November 5, 2007 (Dr. Ke officially complained to the EEOC
on May 20, 2008) and by failing to dual-file with PHRC.

110.   Defendants' race-based discriminatory and hostile conduct, customs,
policies, practices, and procedures against Dr. Ke, as described in the "Facts"

section of this Complaint, are in blatant violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

## THIRD CAUSE OF ACTION—RACIAL DISCRIMINAITON (Both DEFENDANTS)

111.   Paragraphs 1 through 110 are incorporated by reference, as fully as if they were set forth at length herein.

112.   The race-based disparate treatment, hostile labor environment, discrimination, manipulation, and deception to which Dr. Ke was subjected by Defendants, as more fully described above, constitutes a violation of rights protected by "PHRA," 43 P.S. § 951, *et seq.*

**WHEREFORE**, Plaintiff Zhaojin David Ke prays that the Court grant the following relief:

(a) Issue a declaratory judgment to the effect that Defendants have violated Dr. Ke's constitutional, statutory and common law rights.

(b) Enjoin Defendants from failing and refusing to:

(i) provide sufficient remedial relief to make WHOLE Dr. Ke for the losses he has suffered as a result of the discrimination against him, as alleged in this Complaint, including back pay and front pay with interest, future loss of income, and other benefits;

(ii) take other appropriate non-discriminatory measures to overcome the

effects of the discrimination to which Dr. Ke has been subjected.

(c) Award compensatory and punitive damages to charging party Dr. Ke against

APSCUF and Defendant Elder, as would fully compensate him for injuries

resulting from Defendants' discriminatory conduct. And

(d) Award punitive and compensatory damages to Dr. Ke, as would fully

compensate him for injuries resulting from APSCUF's and Defendant Elder's

violation of CBA: Article 3 and Article 15. F.2 and G.3.

In addition, Dr. Ke prays for such additional relief as justice may require, together

with the costs and disbursements in this action.

### JURY DEMAND

Dr. Ke hereby demands a trial by jury of all issues so triable, pursuant to Rule 38

of the Federal Rules of Civil Procedure and §102 of the Civil Rights Act of 1991,

42 U.S.C. §1981a.

Respectfully submitted,

Zhaojin David Ke, pro se
4025 Roosevelt Blvd.
Philadelphia, PA 19124
P: (215) 289-2770
E: david8ke@gmail.com

Date: February 25, 2010

David Ke
4025 Roosevelt Blvd.
Philadelphia, PA 19124

RECEIVED
HARRISBURG, PA

Feb. 26, 2010

ARYE D/ANDREA, Clerk

Per

United States Postal Service®

DELIVERY CONFIRMATION™

0309 1140 0001 5549 2455

US District Court Clerk
Middle District of Pennsylvania
228 Walnut St Ste 1060
Harrisburg, PA 17108



1000

17108



1000

17108